(No. 57721.—

RICHARD BEGG, Appellant, v. BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF PARK RIDGE, *et al.*, Appellees.

*Opinion filed January 20, 1984.*

Daniel P. Jakala and Stanley H. Jakala, of Berwyn, for appellant.

Paul N. Keller, of Park Ridge, for appellees.

Wayne W. Schmidt, of San Francisco, California, and James P. Manak, of Chicago, for *amicus curiae* Americans for Effective Law Enforcement, Inc.

William C. Summers, of Gaithersburg, Maryland, for *amicus curiae* International Association of Chiefs of Police, Inc.

James A. Murphy, of Peoria, for *amicus curiae* Illinois Association of Chiefs of Police, Inc.

Gary M. Lightman and Anthony C. Busillo II, of Mancke, Lightman & Wagner, of Harrisburg, Pennsylvania, for *amicus curiae* Grand Lodge of the Fraternal Order of Police.

JUSTICE CLARK delivered the opinion of the court:

In this case the appellant, Richard R. Begg, a police officer with the city of Park Ridge, was suspended without pay for three days for allegedly failing to meet certain job performance requirements or standards relating to his traffic and nontraffic activities as a police officer. The city's director of public safety ordered the suspension, and that order was affirmed by the Fire and Police Commission after an evidentiary hearing. The appellant then filed an administrative review action in the circuit court of Cook County. The circuit court reversed the commission because it found that appellant was suspended based on a traffic quota system which it held was against public policy. The appellate court, one justice specially concurring, reversed. (110 Ill. App. 3d 941.) The majority of the appellate court held that there was no evidence to suggest that the appellant was being asked to meet standards which were unreasonably high, nor was there any testimony that the appellant or other officers were to issue unjustified citations to meet the standards required of them. (110 Ill. App. 3d 941, 946.) The appellate court further held that the standards provided a means of evaluating officers in terms of minimal performance as well as identifying superior performance and that appellant had failed to demonstrate that even great reliance on such objective standards would be unreasonable. The court held: "Clearly plaintiff [appellant] has failed to meet his burden of establishing that the challenged regulations were arbitrary or unreasonable." 110 Ill. App. 3d 941, 946.

One justice, in what is labeled a special concurrence, believed that "the case should be remanded to the circuit court for a determination of whether there [was a] sufficient basis for suspension of [appellant] without regard to [appellant's] failure to satisfy the requirements of the traffic ticket quota system." 110 Ill. App. 3d 941, 947

(Johnson, P.J., specially concurring).

The appellant filed a petition for leave to appeal in this court, and we granted his petition under our Rule 315 (87 Ill. 2d R. 315). We also granted leave to Americans for Effective Law Enforcement, Inc., the Illinois Association of Chiefs of Police, Inc., and the International Association of Chiefs of Police, Inc., to file a joint brief *amicus curiae* in support of the city of Park Ridge and to the Grand Lodge of the Fraternal Order of Police, who filed a brief *amicus curiae* on behalf of appellant.

At the evidentiary hearing before the Fire and Police Commission the following evidence was adduced: Captain John Baudek, commander of the field operations bureau of the city's police department, issued an order on December 19, 1977, setting certain traffic enforcement standards for patrol officers. The order provided in pertinent part:

"In Park Ridge in 1976, there were over twenty-one hundred motor vehicle accidents and it appears that the number in 1977 will reach or exceed that number.

\* \* \*

. . .a commitment to reducing motor vehicle accidents and the injuries, deaths, and sorrow that accompany them should be a major objective of both the department's administration and officers.

\* \* \*

I believe that the standard detailed below is reasonable considering the numerous other tasks that a patrol officer in Park Ridge must perform. The standard gives both the patrol officer and his supervisors one quantifiable reference point for performance and productivity. It should be pointed out that the standard given is below the standard presently performed by many officers.

While a deviation below the standard does not automatically mean the officer is below an acceptable level of performance, I would expect his supervisor to be able to explain such a deviation if the officer is given an accept-

able rating in that area of performance on his evaluation. The standard for traffic enforcement will be as follows:

With the number of miles that a patrol officer drives during a watch and the high volume of traffic in the Park Ridge area, I believe that it is reasonable for an officer to observe one traffic violation during a watch. Keeping in mind the midnight watch and other consideration[s], a patrol officer will be expected to issue .80 "X" citations per day of patrol over a standard three-month watch cycle."

Baudek testified at the evidentiary hearing before the Fire and Police Commission. He stated that his purpose in issuing the above order was to decrease the number of traffic accidents in Park Ridge. He testified that, since he had issued the order, the number of accidents in Park Ridge had not decreased. But he also stated that the traffic count had increased, a fact which might account for the rise in the number of accidents. The standard was also used as a quantifiable and measurable basis upon which to evaluate the police department's officers. Baudek testified that it provided a measurable standard on which to judge an officer's performance rather than depending solely on a subjective personal opinion of a supervisor.

Baudek explained that an officer was evaluated in three ways. The traffic activities that were discussed in the order were one way, nontraffic activities were the second way, and the subjective evaluation by an officer's watch commander was the third way. In the nontraffic activities category, Baudek testified, an officer was expected to perform such tasks as checking doors of the homes of vacationing residents and schools. Even though there was no set standard for nontraffic activities, supervisors were given averages for each department and watch and were expected to use that average as a basis for comparison. Baudek testified that the traffic and nontraffic activities of a police officer were only a small part of the officer's overall evaluation. An officer's watch commander was responsible for completing his or her evaluation form.

Lieutenant George Teune, the appellant's watch commander, was responsible for evaluating the appellant. At the hearing, Teune testified that the evaluation forms included the two objective performance statistics for traffic and nontraffic activities in addition to other areas of evaluation, such as the officer's amount of initiative, promptness, and the amount of sick time he used. Teune testified that the nontraffic and traffic categories, objective categories, represented 40% to 50% of the overall evaluation of the officer. Teune, contrary to what Captain Baudek had testified, stated that, since the standard (which he believed amounted to a quota system) was instituted, the number of accidents in Park Ridge had decreased. He also testified that the standards established a norm from which an officer's superior performance could be judged.

On April 24, 1980, by order, the appellant was warned his performance as a police officer had fallen below an acceptable level. The appellant's sick time record was described as "if not the poorest on the department, very close to that level." His productivity levels were considered to be "in fact the lowest of any officer on the department by almost any standard used." Appellant's traffic index score was listed at .40 for 1979, and for the first quarter of 1980 it was .15, the lowest in the department and well below the departmental average of .829. In nontraffic activities, the appellant's nontraffic index score was listed at .76 for 1979, and .99 for the first quarter of 1980. The departmental averages for that same period were 1.75 and 1.50 respectively. Appellant was told that he had specific objectives to meet for the second quarter of 1980 or he would be subject to discipline. He was to improve his traffic and nontraffic index scores, reduce his use of sick time (barring any serious illness), refrain from doing anything which would cause disciplinary action to be taken against him, and submit to a physical examination to be performed by a departmental physician. Appellant did fulfill the last

three of these objectives. However, the evidence clearly established that he failed to meet the traffic and nontraffic standards which were set for the second quarter of 1980. A letter of reprimand was consequently issued and the appellant was suspended for three days without pay.

Appellant testified during the hearing to the following facts and opinions. He had been on the Park Ridge police force for 18 years. The index standards, in his opinion, constituted a quota system. He believed that 90% of an officer's evaluation was based on the traffic and nontraffic index standards. He did not believe that the indices were a true reflection of an officer's performance because they did not reflect certain activities an officer performed. Appellant gave the example of a situation where an officer would refer young drivers to their parents rather than give them a ticket if it was a first offense.

In April of 1980, appellant only issued one ticket in 21 days because he believed that the other infractions he had seen were not "of a hazardous nature that would require a ticket." A rolling stop with no traffic present was an example of this type of infraction. In May, the appellant's traffic index was 1.80. Appellant testified that, during that month, he had made a special effort to improve his score.

Appellant stated that in the area of nontraffic activities, checking homes was the highest volume activity. Although he could not name the officers who did it, appellant stated that some officers marked down the time, date, location and condition of homes before they even checked them.

Several officers testified at the hearing expressing their belief that the index standards were in fact quotas and that their evaluations consisted mainly of their scores regarding the index standards. These officers also testified to seeing other officers fill out the forms for recording house checks before they actually went out on patrol. None of the officers could testify that these homes were not subsequently checked.

As we mentioned previously, the Fire and Police Commission, based on the above evidence, found that, since appellant had failed to meet the required traffic and nontraffic indices and had not presented any mitigating circumstances which would excuse his unacceptable performance, his suspension for three days without pay was proper. The circuit court of Cook County reversed the commission's decision based solely on the fact that it found the traffic index standard to be a traffic quota system which it held was against public policy. The appellate court reversed the decision of the circuit court because it held that appellant had failed to sustain his burden of proof to establish that the traffic index standard was arbitrary or unreasonable.

Appellant does not challenge the right of the city of Park Ridge to enforce its traffic laws. However, he does argue that by requiring police officers to meet certain standards of enforcement, the city is violating public policy and issuing an unreasonable, arbitrary and capricious rule. In *Midwest Petroleum Marketers Association v. City of Chicago* (1980), 82 Ill. App. 3d 494, the court held:

> "To constitute a legitimate exercise of the police power, municipal legislation must bear a reasonable relationship to the public interest intended to be protected, and the means adopted must be a reasonable method of accomplishing the desired objective." (82 Ill. App. 3d 494, 500.)

It also held that, "[o]nce the legislative body determines that a problem exists and acts to protect and promote the general welfare of its citizens, the legislation is presumed to be a valid exercise of the city's police power." 82 Ill. App. 3d 494, 500, citing *Union Cemetery Association v. Cooper* (1953), 414 Ill. 23.

Administrative regulations, for purposes of determining their validity, are presumed to be valid. (*Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243.) An administrative regulation will not be set aside unless it

has been clearly arbitrary, unreasonable or capricious (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 310), and the person questioning the validity of the administrative regulation bears the burden of establishing its invalidity (*Illinois State Chamber of Commerce v. Pollution Control Board* (1977), 49 Ill. App. 3d 954, 960).

In the instant case, as was stated in Captain Baudek's order, the city of Park Ridge was faced with an increasing number of motor vehicle accidents. In response to this situation, it issued an order which was meant to reduce motor vehicle accidents, injuries and deaths, by requiring police officers to perform at a certain level in their traffic enforcement activities. This regulation is presumed to be valid and we will not set it aside unless it is shown to be arbitrary, unreasonable or capricious. The appellant has the burden of establishing the regulation's invalidity, since he is the one who is challenging its validity.

Appellant did not present any evidence to demonstrate that the traffic index standard was unreasonable. Neither the appellant nor any other officer testified that he was forced to issue more tickets than were justified in order to meet the traffic-index standard. None of them testified that the .80 standard was an unreasonable or arbitrary standard.

During oral argument before this court, the appellant argued that the means (the traffic index) that the city instituted to achieve the ends (less accidents) were not only against public policy, but were also unsuccessful. However, as the appellate court noted, there was no conclusive evidence presented to show that the traffic-index standard had not reduced the number of accidents. Captain Baudek did testify that the number of accidents had increased but so, too, had the traffic count. Lieutenant Teune testified that since the index was instituted there had been a reduction in the number of accidents. This testimony is inconclu-

sive in establishing the effectiveness of the regulation.

In its *amicus curiae* brief, filed on behalf of the city, Americans for Effective Law Enforcement, Inc., asserted that standards such as the one set in the instant case not only serve to reduce traffic accidents, but also provide a necessary means by which a police department can maintain structure and control over its police officers. It asserted that administrative rulemaking is necessary to assure uniformity in the enforcement of laws in addition to fulfilling the department's need for accountability over its officers.

Appellant contends that the traffic-index standard plays too big a role in the overall evaluation of an officer. Captain Baudek and Lieutenant Teune both testified that the traffic and nontraffic indices were less than 50% of an officer's overall evaluation. The two objective categories were used to make the evaluation less arbitrary. An officer was no longer evaluated solely on the basis of a watch commander's personal opinion. The appellant failed to show that reliance upon these standards in evaluating officers was unreasonable or arbitrary.

Any regulation can be abused by those persons responsible for its enforcement; however, that does not mean that the regulation itself is invalid or against public policy. As we stated earlier in this opinion, the appellant had the burden of establishing that the regulation was arbitrary and unreasonable. He failed to meet that burden.

Accordingly, we affirm the judgment of the appellate court, which reversed the judgment of the circuit court.

*Judgment affirmed.*